IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>vs.<br><br>FREEDA FLYNN<br><br>Defendant | Case No. 2:19-cr-208<br><br>Judge Judge Marbley<br><br>21 U.S.C. § 841(a)<br>21 U.S.C. § 841(b)(1)(c)<br>18 U.S.C. § 1347<br>18 U.S.C. § 2<br><br>FORFEITURE ALLEGATIONS<br><br>INDICTMENT<br><br>Filed Under Seal |

**The GRAND JURY charges:**

At times material to this Indictment:

DEFENDANT

1. Defendant FREEDA FLYNN (FLYNN) was a Medical Doctor in the State of Ohio, licensed under State Medical Board of Ohio Medical License # 35.066409.

2. FLYNN owned and operated a medical practice under her name, and it was located at 67609 Warnock Avenue, St. Clairsville, Belmont County.

3. FLYNN resided at the same address, living in the first floor adjacent to her medical practice.

4. As part of her practice, FLYNN prescribed controlled substances, including highly-addictive opioids. FLYNN was registered with federal and state authorities to prescribe Schedule II-V controlled substances at her practice.

5. FLYNN was the only individual reportedly prescribing controlled substances at her practice. She employed office and medical staff at her office, but was the only licensed Medical Doctor at her practice.

6. As the owner and operator of her practice, FLYNN entered into agreements with the Medicare Program (Medicare), amongst other insurance plans, to receive reimbursement for services provided to eligible patients covered under those programs.

### GENERAL ALLEGATIONS AND TERMINOLOGY

### CONTROLLED SUBSTANCES ACT

7. The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 841(a) *et.seq.* and Title 21, Code of Federal Regulations, Section 1306.04, governed the manufacture, distribution, and dispensation of controlled substances in the United States. The CSA and the Code of Federal Regulations (CFR) contained definitions relevant to this Indictment, some of which are set forth below.

8. The term "controlled substance" meant a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV and V, as designated by Title 21, United States Code, Section 802(c)(6), and the CFR.

9. The designation "Schedule II" meant the drug or other substance had a high potential for abuse; the drug had a currently accepted medical use with severe restrictions; and abuse of the drug or other substance may have led to severe psychological or physical dependence.

10. The designation "Schedule IV" meant the drug or other substance had a low potential for abuse relative to substances that were listed as Schedule III. However, concurrent use of some Schedule II (such as opioids) and Schedule IV controlled substances (such as benzodiazepines) greatly increased a patient's risk of overdose and death.

11. The term "dispense" meant to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance.

12. The term "distribute" meant to deliver (other than by administering or dispensing) a controlled substance.

13. The term "practitioner" meant a medical doctor, physician, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which she or he practiced, to dispense a controlled substance in the course of profit.

14. The Drug Enforcement Administration (DEA) issued registration numbers to qualifying doctors, who thereby became authorized to dispense Schedule II, III, IV, and V controlled substances. To issue a prescription for a controlled

3

substance, a doctor must have had a DEA registration number for each location in which they were dispensing medicine, and for each state where the doctor was prescribing controlled substances.

15. The term "dosage" was the amount, frequency, and number of doses of medication authorized by a practitioner with a valid DEA registration number.

16. The term "prescription" meant an order for medication which was dispensed to or for an ultimate user but does not include an order for medication which is dispensed for immediate administration to the ultimate user.

17. Title 21, Code of Federal Regulations, Section 1306.04 provided that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."

18. Under the CSA and CFR, a prescription for a controlled substance was unlawful unless issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice.

19. Hydrocodone was a Schedule II opioid controlled substances.

20. Clonazepam (commonly known by brand name Klonopin®) and diazepam (commonly known by brand name Valium®) were Schedule IV benzodiazepine controlled substances.

21. Tramadol was a Schedule IV opioid controlled substance.

4

22. Zolpidem (known by brand name Ambien®) was a Schedule IV tranquilizer used to treat sleep disorders. When prescribed alongside opioids and other controlled substances, however, this medication had dangerous potentiation effects and increased the risk of overdose and death to patients.

### VICTIM HEALTH INSURANCE PROGRAMS

23. The information provided in this section describes the Victim Health Insurance Programs (See "Attachment A" which is incorporated into this Indictment and serves as the Fed. R. Crim. P. 12.4 Disclosure Statement).

Medicare

24. Medicare was a federal health insurance program providing benefits to persons who are 65 or older or are eligible due to certain disabilities. The individuals who received Medicare benefits are referred to as "beneficiaries."

25. Medicare was a "health care benefit program" as defined by 18 United States Code, Section 24(b).

26. Medicare was administered through the Centers for Medicare and Medicaid Services (CMS). CMS was a subsidiary agency of the United States Department of Health and Human Services.

27. Medicare Part B, which CMS described as medical insurance, covered certain doctors' services, outpatient care, and medical supplies.

28. Medicare Part D, described as prescription drug coverage, subsidized the costs of prescription drugs for Medicare beneficiaries. It was enacted in 2003

5

and went into effect on January 1, 2016. Medicare beneficiaries could obtain Part D benefits in two different ways: they could join a Prescription Drug Plan, which covers only prescription drugs, or they could join a Medicare Advantage Plan that covers both prescription drugs and medical services.

29. Medicare beneficiaries enrolled in a Medicare Part D plan typically filled their prescriptions at a pharmacy utilizing their Part D plan coverage to pay for the prescription. The pharmacy then submitted the prescription claim for reimbursement to the Medicare beneficiary's Part D plan.

30. Medicare insurers were compensated for the provision of medical services, including prescription drugs, which were medically necessary and in compliance with state and federal laws, rules, and regulations. Health care service providers were required to verify that requirement as part of the process to become a Medicare provider, and acknowledge the criminal penalties for individuals who knowingly and willfully execute a scheme or artifice to defraud any health care benefit program, or obtain, by means of false or fraudulent pretenses, representations, or promises, any money from a health care benefit program.

31. Further, health care practitioners were required to acknowledge that the unique Medicare identification number issued to a solo practitioner could be used only by that practitioner, or a supplier to whom the practitioner has reassigned benefits under current Medicare regulations, when billing for services rendered by the practitioner.

## COUNTS ONE THROUGH EIGHT

### UNLAWFUL DISTRIBUTION AND DISPENSING OF CONTROLLED SUBSTANCES

32. Paragraphs 1 through 31 of the Indictment are incorporated by reference as though fully set forth herein.

33. On or about the dates set forth below, in the Southern District of Ohio, and elsewhere, the defendant FREEDA FLYNN knowingly, intentionally, and unlawfully dispensed and distributed, and caused to be dispensed and distributed, outside the usual course of professional practice and not for a legitimate medical purpose, the controlled substances listed below to patient R.A., each of which constitutes a separate count of this Indictment:

| Ct. | Date of Written Prescription | Controlled Substance(s), Prescriptions |
|---|---|---|
| 1 | 6/30/15 | Hydrocodone; Diazepam |
| 2 | 3/1/2016 | Hydrocodone; Zolpidem |
| 3 | 12/20/2016 | Hydrocodone |
| 4 | 2/14/2017 | Hydrocodone; Clonazepam; Zolpidem |
| 5 | 3/14/2017 | Hydrocodone; Clonazepam |
| 6 | 3/28/2017 | Hydrocodone; Clonazepam |
| 7 | 8/1/2017 | Hydrocodone; Clonazepam; Tramadol |
|  |  |  |

7

| 8 | 10/24/2017 | Hydrocodone; Clonazepam; Tramadol; Zolpidem |

In violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 18 U.S.C. § 2.

## COUNT 9

### HEALTH CARE FRAUD

34. Paragraphs 1 through 33 are incorporated by reference as though fully set forth herein.

35. From at least January 1, 2015 and continuing to on or about October 24, 2017 in the Southern District of Ohio and elsewhere, the defendant, FREEDA FLYNN, in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, by causing the submission of 1) prescriptions for dangerous controlled substances to Medicare beneficiary R.A. which were prescribed outside the usual course of medical practice and without a legitimate medical purpose; and 2) office visits, drug testing, and health care services performed for R.A. outside of the usual course of professional practice and without a legitimate medical purpose, in conjunction with those unlawful prescriptions.

8

## PURPOSE OF THE SCHEME AND ARTIFICE

36. The Grand Jury realleges and incorporates by reference Paragraph 35 of this Indictment as a description of the purpose of the scheme and artifice.

## THE SCHEME AND ARTIFICE

37. The Grand Jury realleges and incorporates by reference Paragraphs 35 and 38 of this Indictment as a description of the scheme and artifice.

## EXECUTIONS OF THE SCHEME AND ARTIFICE

38. On or about the dates specified above, in the Southern District of Ohio, and elsewhere, FREEDA FLYNN, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, submitted or caused to be submitted the following false and fraudulent claims to Medicare for unlawfully prescribed controlled substances and medically inadequate services to beneficiary R.A., in an attempt to execute, and in execution of the scheme as described in Paragraphs 35 through 37 as an ongoing scheme from at least January 1, 2015 through October 24, 2017:

| Count | Approximate Amount Billed | Approximate Amount Paid |
|---|---|---|
| 9 | $19,878.01 | $9,593.81 |

**In violation of 18 U.S.C. §§ 1347 and 18 U.S.C. § 2.**

## FORFEITURE ALLEGATIONS

39. The allegations contained in paragraphs 1 through 38, and specifically Counts 1 through 24, are incorporated here for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853.

40. Upon conviction of a violation of Title 21, United States Code, Sections 841, as alleged in Counts 1 through 8 of this Indictment, the defendant FREEDA FLYNN shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses.

41. Upon conviction of the offenses in violation of Title 18, United States Code, Section 1347 set forth in Counts 21 through 24 of this Indictment, the defendant FREEDA FLYNN shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

42. The property to be forfeited includes, but is not limited to, the following:

    a. any property, real or personal, that constitutes or is derived, directly or indirectly, as the result of such violation;

    b. any DEA license(s) for FLYNN; and

    c. any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

43. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

10

       i.       cannot be located upon the exercise of due diligence;

      ii.      has been transferred or sold to, or deposited with, a third party;

     iii.     has been placed beyond the jurisdiction of the Court;

     iv.     has been substantially diminished in value; or

      v.      has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. §982(a)(7), 28 U.S.C. § 2461(c), and Title 21, United States Code, Section 853(a).

A TRUE BILL:

s/ Foreperson
FOREPERSON


ALLAN J. MEDINA
UNITED STATES DEPARTMENT OF JUSTICE
ACTING CHIEF, HEALTH CARE FRAUD UNIT
CRIMINAL DIVISION, FRAUD SECTION

CHRISTOPHER M. JASON
Trial Attorney
United States Department of Justice, Criminal Division


BENJAMIN C. GLASSMAN
United States Attorney

BRENDA SHOEMAKER
Deputy Criminal Chief
United States Attorneys' Office
Southern District of Ohio